UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------------ x

LATOSHA LEE,                                             :
                                                        :
                                   Plaintiff,           :        No. 1:19-cv-02751-LAK
                                                        :
                       - against -                      :
                                                        :
BLACK ENTERTAINMENT TELEVISION                          :
LLC, a foreign limited liability company;               :
FLAVOR UNIT ENTERTAINMENT, INC., a                      :
foreign corporation; NICCI GILBERT,                     :
individually,                                           :
                                                        :
                                   Defendants.          :

------------------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS

DAVIS WRIGHT TREMAINE LLP

Elizabeth A. McNamara
Jeremy A. Chase
Meredith I. Santana
1251 Avenue of the Americas, 21st Floor
New York, NY  10020-1104
Telephone: (212) 489-8230
Email: lizmcnamara@dwt.com
        jeremychase@dwt.com
        meredithsantana@dwt.com

*Attorneys for Defendant Black
Entertainment Television LLC*

EISENBERG TANCHUM & LEVY LLP

Stewart L. Levy
707 Westchester Avenue, Suite 300
White Plains, New York 10604
Telephone: (212) 599-0777
Email: slevy@etllaw.com

*Attorneys for Defendant Flavor Unit
Entertainment, Inc.*

NICOLE J. COWARD, PLLC

Nicole J. Coward
8 West 126th Street, 3rd Floor
New York, New York 10027
Telephone: (646) 798-4500
Email: nicole@nicolecowardlaw.com

*Attorneys for Defendant Nicci Gilbert*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................... 1

FACTS ............................................................................................................................... 2

    A.    The Parties ................................................................................................. 2

    B.    The Two Works ........................................................................................ 3

          1.    The *Real Life Cinderellas Atlanta* Treatment ............................... 3

          2.    *From the Bottom Up* ...................................................................... 6

    C.    The Complaint .......................................................................................... 9

ARGUMENT ................................................................................................................... 10

I.    COURTS MUST DISMISS COPYRIGHT INFRINGEMENT CLAIMS WHEN THE PARTIES' WORKS ARE NOT SUBSTANTIALLY SIMILAR ..................................... 10

    A.    To State a Claim for Copyright Infringement, There Must Be Substantial Similarity of Protectable Expression, Not Unprotectable Facts, Ideas, or Scènes à Faire ......................................................................................... 10

    B.    Courts May Dismiss Claims for Copyright Infringement on Substantial Similarity Grounds by Examining the Two Works at Issue, Without Fact Discovery ................................................................................................. 13

II.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR COPYRIGHT INFRINGEMENT OF THE TREATMENT ............................................................................................. 14

    A.    The Treatment Does Not Contain Any Protectable Elements to Support a Claim of Infringement ............................................................................. 15

    B.    The Two Works Are Not Substantially Similar ....................................... 18

          1.    The Plots Are Not Substantially Similar ........................................ 18

          2.    The Characters Are Not Substantially Similar ............................... 20

          3.    The Theme and Mood Are Not Substantially Similar ..................... 21

          4.    The Settings Are Not Substantially Similar ................................... 23

          5.    The Total Concept and Feel of the Two Works Are Different ........ 24

CONCLUSION ................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*8th Wonder Entm't, LLC v. Viacom Int'l, Inc.*,
   No. 14-cv-01748, 2016 WL 6882832 (C.D. Cal. Nov. 22, 2016) .................................. *passim*

*Arica Inst., Inc. v. Palmer*,
   970 F.2d 1067 (2d Cir. 1992).................................................................................12

*Bethea v. Burnett*,
   No. CV04-7690, 2005 WL 1720631 (C.D. Cal. June 28, 2005) ......................................18, 21

*Castle Rock Entm't v. Carol Publ'g Grp.*,
   150 F.3d 132 (2d Cir. 1998)................................................................................10, 11

*Castorina v. Spike Cable Networks, Inc.*,
   784 F. Supp. 2d 107 (E.D.N.Y. 2011) ...................................................................1, 11, 14, 17

*CBS Broad., Inc. v. Am. Broad. Co.*,
   No. CV 12-04073, 2012 WL 13013027 (C.D. Cal. June 21, 2012) .......................1, 17, 18, 20

*Chambers v. Time, Inc.*,
   282 F.3d 147 (2d Cir. 2002).................................................................................3

*Contender Partners, LLC v. Azteca Int'l Corp.*,
   No. CV 08-02026, 2009 WL 10670472 (C.D. Cal. July 22, 2009) .......................................17

*Dellar v. Samuel Goldwyn, Inc.*,
   150 F.2d 612 (2d Cir. 1945)................................................................................1

*DuckHole Inc. v. NBC Universal Media LLC*,
   No. CV 12-10077, 2013 WL 5797279 (C.D. Cal. Sept. 6, 2013)...........................................16

*Feist Publ'ns, Iinc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340, 111 S. Ct. 1282 (1991)..............................................................................10, 12

*Folio Impressions, Inc. v. Byer Cal.*,
   937 F.2d 759 (2d Cir. 1991)................................................................................11

*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*,
   139 S. Ct. 881 (2019)......................................................................................3

*Gal v. Viacom Int'l, Inc.*,
   403 F. Supp. 2d 294 (S.D.N.Y. 2005)..........................................................................13

ii

*Gaste v. Kaiserman*,
   863 F.2d 1061 (2d Cir. 1988)......................................................................................10

*Hoehling v. Universal City Studios, Inc.*,
   618 F.2d 972 (2d Cir. 1980)........................................................................................12

*I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*,
   307 F. Supp. 2d 521 (S.D.N.Y. 2004)...........................................................................3

*Jones v. CBS, Inc.*,
   733 F. Supp. 748 (S.D.N.Y. 1990) .........................................................................19, 24

*Jorgensen v. Epic/Sony Records*,
   351 F.3d 46 (2d Cir. 2003)..........................................................................................10

*Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*,
   945 F.2d 509 (2d Cir. 1991)........................................................................................11

*Milano v. NBC Universal, Inc.*,
   584 F. Supp. 2d 1288 (C.D. Cal. 2008) ..................................................................20, 22

*Nichols v. Universal Pictures Corp.*,
   45 F.2d 119 (2d Cir. 1930)..........................................................................................19

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010)......................................................................................11, 13

*Pino v. Viacom, Inc.*,
   No. 07-cv-3313, 2008 WL 704386 (D.N.J. Mar. 4, 2008) .................................15, 19

*Polsby v. St. Martin's Press, Inc.*,
   8 F. App'x 90 (2d Cir. 2001) ......................................................................................13

*Repp v. Webber*,
   132 F.3d 882 (2d Cir. 1997).....................................................................................10, 11

*Reyher v. Children's Television Workshop*,
   533 F.2d 87 (2d Cir. 1976).......................................................................................12, 24

*Rodriguez v. Heidi Klum Co.*,
   No. 05 Civ. 10218, 2008 WL 4449416 (S.D.N.Y. Sept. 30, 2008) .............11, 15, 23

*Walker v. Time Life Films, Inc.*,
   784 F.2d 44 (2d Cir. 1986).......................................................................................12, 13

*Warner Bros. v. American Broad. Cos.*,
   720 F.2d 231 (2d Cir. 1983).........................................................................................3

*Williams v. A & E Television Networks,*
    122 F. Supp. 3d 157 (S.D.N.Y. 2015)....................................................................1, 14, 15, 17

*Williams v. Crichton,*
    84 F.3d 581 (2d Cir. 1996)............................................................................... *passim*

*Zella v. E.W. Scripps Co.,*
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) .........................................................................14, 16

**Statutes**

17 U.S.C. § 505.......................................................................................................................1

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................................1, 2, 13, 25

Fed. R. Evid. 201(b).................................................................................................16

Defendants Black Entertainment Television LLC ("BET"), Flavor Unit Entertainment, Inc. ("Flavor Unit"), and Nicci Gilbert hereby submit this memorandum of law in support of their motion pursuant to Fed. R. Civ. P. 12(b)(6) for an order dismissing the Complaint and awarding their attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## INTRODUCTION

This lawsuit epitomizes what the Second Circuit described as "that obsessive conviction, so frequent among authors . . . , that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." *Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612, 613 (2d Cir. 1945). Based on nothing more than the fact that they share a similar premise— a reality show following a collection of semi-prominent African-American women in Atlanta who have faced adversity in their lives—plaintiff Latosha Lee claims that BET's reality show *From the Bottom Up* copied her never-produced treatment *Real Life Cinderellas Atlanta*. But a cursory review of the works confirms that, to the extent Plaintiff's treatment contains *any* protectable elements at all, the two works are not remotely similar—let alone substantially similar.

The lack of substantial similarity between these two works is underscored by the genre they occupy. Because reality television typically relies on standard plot devices that are not protected by the Copyright Act, courts consistently reject copyright claims involving reality programs. *See*, *e.g.*, *Williams v. A & E Television Networks*, 122 F. Supp. 3d 157, 164 (S.D.N.Y. 2015) (reality television show *Married at First Sight* did not infringe treatment for "Married at 1st Sight"); *Castorina v. Spike Cable Networks, Inc.*, 784 F. Supp. 2d 107, 111–12 (E.D.N.Y. 2011) (*Pros vs. Joes* did not infringe treatment for sports-themed reality show "Two Left Feet"). As one Court recently observed, "'[r]eality,' it turns out is hard to copy.'" *CBS Broad., Inc. v. Am. Broad. Co.*, No. CV 12-04073, 2012 WL 13013027, at *8 (C.D. Cal. June 21, 2012).

Like other copyright infringement claims in the reality TV genre, a comparison of

1

Plaintiff's treatment with *From the Bottom Up* mandates dismissal because her claim rests on nothing more than the purported use of a broad idea and stock elements that flow directly from it. Plaintiff does not (and cannot) allege that Defendants used any protectable expression from her treatment in *From the Bottom Up*. The Copyright Act does not protect the abstract ideas pressed here or the stock elements (so-called *scènes à faire*) that necessarily flow from such ideas. Instead, Plaintiff must show that Defendants copied her original "expression." To do so, she must establish that the plot, themes, setting, and characters described in her work are (1) protectable, and (2) substantially similar to those elements of *From the Bottom Up*. But Plaintiff cannot come close to meeting her burden. Since this total lack of similarity of protected expression may be readily determined as a matter of law, this Court should dismiss the Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), and award Defendants their attorneys' fees as prevailing parties.

## FACTS

### A.     The Parties

Plaintiff Latosha Lee ("Plaintiff") is the creator of a treatment for a reality television program titled *Real Life Cinderellas Atlanta* (the "Treatment").[1]  Declaration of Jeremy A. Chase ("Chase Decl.") Ex. A ("Compl.") ¶¶ 1, 3.  Defendant Flavor Unit is the production company that created the reality television series *From the Bottom Up* ("*From the Bottom Up*" or the "Series"), which Plaintiff alleges infringes her copyright in the Treatment, and Defendant Nicci Gilbert ("Gilbert") is the producer of the Series.  *Id.* ¶¶ 5, 6.  Defendant BET licenses the Series from Flavor Unit.  *Id.* ¶ 4.

---

[1] For purposes of this motion only, Defendants accept as true all factual allegations in the Complaint.

B.    **The Two Works**

Since "a determination of substantial similarity requires a detailed examination of the works themselves," *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996) (citation and quotation marks omitted), a summary of each of the works at issue follows.[2]

1.    **The *Real Life Cinderellas Atlanta* Treatment**

Plaintiff created a treatment for *Real Life Cinderellas Atlanta* in 2013 and created a sizzle reel and second treatment sometime thereafter.  Compl. ¶¶ 13, 15, 16, 19.  Plaintiff later registered one of the treatments for *Real Life Cinderellas Atlanta* on June 18, 2013 ("Treatment").[3]  *Id.* ¶ 15.

---

[2] To provide the Court with the opportunity to review the works in their entirety, as the law requires, copies of the deposit copy of *Real Life Cinderellas Atlanta* on file with the Copyright Office and Seasons 1-3 of *From the Bottom Up* are annexed to the Chase Declaration as Exhibits B and C respectively.  *See Warner Bros. v. American Broad. Cos.*, 720 F.2d 231, 240-41 (2d Cir. 1983) (substantial similarity requires review of the two works at issue).  The two works are properly considered on this motion because they are central to Plaintiff's claim and are both referenced in the Complaint.  *Chambers v. Time, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (stating that on a motion to dismiss courts may review the works themselves and any documents on which the plaintiff relied in drafting the complaint).

[3] Plaintiff does not allege that she registered the sizzle reel or indicate which of the two treatments she actually registered.  However, Plaintiff's allegation that "[i]n the second treatment, [she] specifically identified Maia Campbell as a proposed cast member of the show," together with the fact that the deposit copy features Maia Campbell as a cast member, suggest that Plaintiff registered the second treatment, not the first.  Compl. ¶ 20. When asked to provide a copy of the registered treatment and to confirm which treatment forms the basis of Plaintiff's claim, Plaintiff's counsel provided a copy of a treatment that does not match the deposit copy on file with the Copyright Office and thus appears to be unregistered ("Unregistered Treatment").  *See* Chase Decl. Ex. D; *compare* Ex. B (Deposit Copy) *with* Ex. E (Unregistered Treatment).  Plaintiff cannot base her claim on the Unregistered Treatment, even if it is the preexisting work on which the registered Treatment is based.  *See Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 886 (2019) (copyright registration is a prerequisite to filing a copyright infringement claim); Ex. E (Copyright Catalog Entry for Plaintiff's Registration, No. Pau003682804) (failing to identify a preexisting work); *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 521, 529 (S.D.N.Y. 2004) (dismissing claim based on an unregistered, preexisting work where plaintiff registered a subsequent work whose registration "d[id] not identify the preexisting work that is the foundation of this action").  For that reason, Defendants base their analysis on the registered Treatment (Ex. B), rather than the treatment provided by Plaintiff's counsel. Notwithstanding the foregoing, Defendants' analysis mandates dismissal regardless of whether the registered Treatment or the Unregistered Treatment is at issue.

The Treatment loosely describes the concept of a reality television show "highlight[ing] the daily lives of women with publicized scandals seeking redemption."  *Id.* ¶ 14.  The Treatment profiles prospective cast members—five African-American women, including Plaintiff—most of whom are aspiring singers or actresses.  The cast members the Treatment identifies are:

1.  Plaintiff, a self-described actress and entrepreneur who has been "[l]abeled as a mistress [and] home wrecker."

2.  Farrah Franklin, a former member of the R&B group Destiny's Child and now aspiring solo singer and actress, who is perceived to be an "[o]ut of control, alcoholic . . . washed-up talent."

3.  Maia Campbell, a successful '90s actress who is now perceived to be a "drug addict, washed up talent."

4.  Montana DeLeon, a makeup artist with a large YouTube following and former "booty model[]" who is viewed as a "stripper, prostitute, porn star."

5.  Ciara Elle, a "[l]ife [c]oach, [m]entor, [a]uthor, and [c]ounselor" who is perceived by others as a "failure" and a "[p]roduct of her environment" who "will end up unsteady."

Ex. B (Treatment) at 2-3, 9-15; *see also* Compl. ¶ 14 (describing the cast members).

The first few pages of the Treatment, headlined "Media Versus Reality," introduce the proposed cast members with a photo and a brief description comparing the media's purported perception of each woman with "reality."  Ex. B (Treatment) at 2-3.  For example, Plaintiff's description includes a photograph of Shaquille O'Neill next to a semi-nude selfie of Plaintiff and describes Plaintiff as follows:

| **Perceived as by Media** | **Reality** |
|---|---|
| Labeled as a mistress, home wrecker, unintelligent, uneducated, stripper, groupie, gold digger, crazy, not a good mother | A very ambitious and determined self-sufficient businesswoman. She sets out every day to make her dreams come true for her and her son of [sic] which she loves so dearly. She is destined to be a successful actress and entrepreneur. Doconomy [sic]: Fun, nice, giving, Firecracker |

*Id.* at 2.

The next section of the Treatment lists (1) "themes" for the show (e.g., "You think you know us, but you have no clue!"; "It Factor: Yes, that's who we were and those are the things that we endured, but this is who we are now and this is what we are doing."); (2) ideas for "conflict/drama" among the characters (e.g., "Farrah: has dated some of the same guys as Latosha Lee."; "Maia Campbell: is admittedly bipolar."; "Maia, Latosha, Montana, Ciara, Farah: All love attention! (Heightens drama)."); and (3) ideas for personal goals and projects for each cast member to pursue over the course of the program (e.g., "Montana DeLeon: will continue to do self-motivating speeches but on a larger scale."; "Latosha Lee: will continue to work on her call center/debt collection business."). *Id.* at 4-6. The Treatment also proposes Atlanta, Georgia as the setting of the program. *Id.* at 4.

The remainder of the Treatment focuses exclusively on the biographies of the cast members, including a description of which cast members are already friends or acquainted in some manner (e.g., "Latosha Lee and Ciara Elle are friends and Ciara was a client of Latosha Lee."; "Latosha Lee and Maia Campbell have done a movie together but never filmed on the set at the same time.") as well as a photo and one-page biographical profile of each woman. *Id.* at 7-15.

 2.    *From the Bottom Up*

*From the Bottom Up* is a reality television series that takes place in Atlanta, Georgia and depicts the lives of several African-American women who are trying to rebuild their lives after having spent time in jail or prison or are overcoming other personal problems.  The premise of the show is that the women in the group rely on each other for emotional support as they make a new start and work through the problems in their personal and professional lives.  Ex. C (Series).  The original cast members in Season 1 were:

 1.    Chrystale Wilson, a former actress and aspiring rapper who shot (but did not kill) a man in self-defense in an altercation at a music festival in Atlanta.

 2.    Stacii Jae Johnson, a former actress and fundraiser for the mayor of Atlanta who was charged with driving under the influence and resigned from her position in the mayor's office as a result.

 3.    Christine Beatty, former chief of staff for Detroit mayor Kwame Kilpatrick, with whom she had an extramarital affair.  Christine later resigned and served 120 days in jail after pleading guilty to two counts of perjury in connection with trial testimony in which she denied having an affair with Kilpatrick.

 4.    Kim Smedley, a cosmetologist who served 15 months in federal prison for performing backroom silicone injections.

 5.    Sara Stokes, an R&B singer, who participated in the MTV reality series *Making the Band: 2* and was arrested and sentenced to 90 days in county jail following a domestic dispute with her husband of 19 years.

*See* Ex. C, Episode 101.

In Season 2, the original five cast members are joined by two new members: Chanita Foster and Maia Campbell.  *Id.* at Episodes 201, 202.  Maia was a successful television actress in the 1990s but has been arrested and spent time in rehab for substance abuse issues several times over the years and suffers from bipolar disorder.  *Id.* at Episode 203.  Chanita, best known for being the

6

wife of former NFL player George Foster and a former cast member of the reality series *Football Wives*, is recovering from depression. *Id.* Season 3 introduces five new cast members, while certain cast members from prior seasons make occasional appearances. *See, e.g.*, *id.* at Episodes 301, 303.[4]

*From the Bottom Up* follows a standard reality television format: unscripted scenes depicting the cast members as they interact with one another and go about their daily lives, interspersed with one-on-one interviews with the cast members commenting on the events depicted in the episode. Every episode opens with a montage of images of Atlanta set to upbeat, hip hop music and captures the group as they spend time together at dinners, charity events, and other bonding activities. In other scenes, two or three of the women meet together for dinner or drinks to get to know each other better, talk through some of the personal problems they are facing, or air out their grievances. And as is typical of the reality television genre, every episode invariably features a conflict or "drama" between the cast members.

For example, in Episode 101, the first episode of the Series, each cast member introduces herself and her background, including the circumstances surrounding her run-in with the law. Stacii, Chrystale, Christine, and Kim meet for the first time at a restaurant for lunch. Ex. C, Episode 101. They each share their criminal past and other difficulties and discuss the importance of supporting one another. *Id.* Tensions rise after Stacii interrupts Kim, while she is sharing her

---

[4] The new cast members are: (1) Tamika Wright, a store owner who was charged with conspiracy to defraud the government in connection with her stores' alleged misuse of Women, Children, and Infants (WIC) government benefits; (2) Angela Stanton, an author who was imprisoned for two and half years for insurance fraud; (3) Brandi Davis, who served seven and a half years in prison for trafficking cocaine; (4) Danielle Jones, a personal trainer whose workout videos with her young daughter have gone viral and who is raising her daughter alone after breaking up with her boyfriend, the father of her daughter; and (5) Iesha Jeng, a fashion designer battling depression and rebuilding her life after divorcing her husband, whom she forced to move out of their home at gunpoint. Ex. C at Episodes 302, 303.

story with the group, to say that she wanted plastic surgery to enlarge her breasts.  *Id.*  Others in the group chastise Stacii for being disruptive, and the women begin to argue.  *Id.*  Interspersed throughout the lunch scene are clips of the cast members' individual commentary about the lunch and the argument that took place, including Chrystale complaining about Stacii's self-centeredness, and Kim questioning Stacii's account of her DUI arrest.  *Id.*  At the end of the meal, Christine reveals that she plans to invite a friend from Michigan into the group, Sara Stokes.  *Id.*  The next scene shows Sara as she is being released from a 90-day jail sentence related to a domestic dispute with her husband.  *Id.*  Sara's husband and two daughters are waiting for her when she is released, and immediately Sara and her husband launch into an argument.  *Id.*  The episode culminates with Sara deciding to accept Christine's invitation to go to Atlanta to join the group and take a break from her marriage.  *Id.*  In Episode 102, Sara arrives in Atlanta and visits Christine's home to catch up.  Ex. C at Episode 102.  Sara and Christine have a heart-to-heart about their shared experiences going to jail.  *Id.*  In another scene, Christine and Kim attend a group therapy session together with their kids.  *Id.*  Throughout each scene the cast members provide their own (often colorful) commentary on the events depicted in the episode.  *Id.*

Later seasons follow the same formula.  For example, in Episode 207, Kim meets Chrystale at her work studio to discuss an argument with Stacii that took place on the group's trip to the Bahamas and to discuss Maia's whereabouts.  Ex. C at Episode 207.  In the next scene, Sara invites the entire group to a pole-dancing class as a way to celebrate the recent successes in Sara's life, including her marriage vow renewal and her new radio show with Playboy.  *Id.*  The scene shows the women practicing their moves, interspersed with clips of each one of them commenting on the class.  *Id.*  Kim, for example, described the experience as, "Honey, we was looking like a bunch of geriatrics out there."  *Id.*  At the end of the class, the group discusses their plan to host a charity

fundraising event, and the discussion inevitably devolves into an argument when Chanita disengages from the conversation because someone suggested supporting an organization other than Chanita's favorite charity.  *Id.*  Later in the episode, Chrystale meets with Maia's godmother to discuss her concerns about Maia's mental health and learns that Maia is not able to rejoin the group because she requires more support than the group can provide.  *Id.*

      **C.**     **The Complaint**

      Plaintiff alleges that *From the Bottom Up* infringes her copyright in the *Real Life Cinderellas Atlanta*.  Yet Plaintiff identifies only a few similarities between the two works, each at the highest level of generality.  Plaintiff alleges that the "theme and overall mood for the two shows are substantially similar" because "[n]o reality show prior to *'Real Life Cinderellas of Atlanta'* had focused on the daily lives of women that experienced negative media publicity who wanted to turn their lives around [and] BET publicized and continues to publicize [*From the Bottom Up*] and Lee's Copyrighted Work as a 'docu-series following women who have experienced complex adversity.'"  Compl. ¶ 40.  The Complaint alleges "[t]he plots of [*From the Bottom Up*] and Lee's Copyrighted Work are nearly identical" because "[b]oth consist of the same sequence of events: 1) bad publicity in the media; 2) different or changed circumstances; 3) starting over and trying to obtain success in personal and professional life."  *Id.* ¶ 41.  Plaintiff further alleges that the settings of the show are the same because both are set in Atlanta, and *From the Bottom Up* "also uses the same artistic choices in cast members" as the Treatment because:

> The characters of both shows, are five African-American women of a specific type (singers, actresses, business owners, and the former paramour of a high profile professional athlete) who seemed to have "had it all," but their personal and professional lives were ruined due to public scandal: each either served time in prison, cheated on their husbands, or were arrested for DUI, substance abuse, and/or domestic violence.

9

*Id.* ¶¶ 42-43.  According to Plaintiff, these purported similarities are proof that the two works are "so similar that the ordinary observer can only conclude that *'From the Bottom Up'* would not exist but for the copying of *'Real Life Cinderellas of Atlanta.'*"  *Id.* ¶ 60.  On the backs of these abstract and incidental similarities, Plaintiff brings a claim of copyright infringement against BET. *Id*. ¶¶ 55-76.

## ARGUMENT

### I. COURTS MUST DISMISS COPYRIGHT INFRINGEMENT CLAIMS WHEN THE PARTIES' WORKS ARE NOT SUBSTANTIALLY SIMILAR

#### A. To State a Claim for Copyright Infringement, There Must Be Substantial Similarity of Protectable Expression, Not Unprotectable Facts, Ideas, or Scènes à Faire

"Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying."  *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296 (1991).  To prevail on a claim of copyright infringement, "'a plaintiff must first show that his work was actually copied . . . . [and] then must show that the copying amounts to an improper or unlawful appropriation.'"  *Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 137 (2d Cir. 1998) (citation omitted).  In the absence of direct evidence of copying, a copyright plaintiff must first allege facts to show that the defendant had "a reasonable possibility of access" to the preexisting work and that there are similarities in the allegedly infringing work that are probative of copying.[5]  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 54 (2d Cir. 2003); *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988).  "'It is only *after* actual copying is established that one claiming infringement' then proceeds to demonstrate

---

[5] The Complaint alleges Defendants Flavor Unit and Gilbert had access to Plaintiff's Treatment, but affirmatively alleges that Plaintiff had "not pitched [the Treatment] to BET."  Compl. ¶ 30. But the Court need not resolve that issue because, solely for purposes of this motion, and because the lack of substantial similarity between the two works is dispositive, Defendants assume access.

that the copying was improper or unlawful by showing that the second work bears 'substantial similarity' to *protected expression* in the earlier work." *Castle Rock Entm't*, 150 F.3d at 137 (quoting *Repp*, 132 F.3d at 889) (emphasis added).

To determine whether two works are substantially similar, courts in the Second Circuit generally apply the "ordinary observer test," asking whether a "lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590.  But where, as here, the works in question contain both protectable and unprotectable elements, courts must apply a "more discerning 'ordinary observer' test." *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 766 (2d Cir. 1991) (more discerning analysis is required where plaintiff's work is not wholly original but rather incorporates public domain elements); *see also Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*, 945 F.2d 509, 514 (2d Cir. 1991) (works that consist of both protectable and unprotectable elements "require[] a somewhat more refined analysis than is applied in a case involving a wholly original work"); *Rodriguez v. Heidi Klum Co.*, No. 05 Civ. 10218, 2008 WL 4449416 (S.D.N.Y. Sept. 30, 2008) (applying more discerning observer test to fashion design reality television show claim); *Castorina*, 784 F. Supp. 2d at 110 (applying more discerning observer test to claim involving *Pros vs. Joes* reality show).  In applying the more discerning ordinary observer test, "[w]hat must be shown is substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed [work]." *Key Publ'ns, Inc.*, 945 F.2d at 514.  The Court "must attempt to extract the unprotect[a]ble elements from . . . consideration and ask whether the protect[a]ble elements, standing alone, are substantially similar[.]" *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010). In doing so, the Court must compare the "total concept and overall feel" of the two works.  *Id.* (citations omitted).

11

Plaintiffs bear a high burden in establishing copyright infringement and must demonstrate that the defendant has "appropriated the 'fundamental essence or structure' of plaintiff's work." *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1073 (2d Cir. 1992) (quoting 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 13.03[A][1] at 13-27 (defining "comprehensive nonliteral similarity")). Moreover, "the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976). The works must share similarities in "such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." *Williams*, 84 F.3d at 588.

In performing the substantial similarity analysis, there are several foundational principles the court must apply. *First*, "[i]t is a principle fundamental to copyright law that a copyright does not protect an idea, but only the expression of an idea." *Id.* at 587 (internal quotation marks and citations omitted). *Second*, copyright law does not protect stock scenes or *scènes à faire*, the "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980), or "thematic concepts . . . which necessarily must follow from certain plot situations." *Reyher*, 533 F.2d at 91; *see Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (finding "[e]lements such as drunks, prostitutes, vermin and derelict cars" as well as "[f]oot chases[,] . . . the morale problems of policemen . . . [and] the Irish cop" are unprotectable *scènes à faire* in a police story set in the Bronx). *Third*, facts "are not original and therefore may not be copyrighted." *Feist Publ'ns*, 499 U.S. at 350, 111 S. Ct. at 1290.

B.     **Courts May Dismiss Claims for Copyright Infringement on Substantial Similarity Grounds by Examining the Two Works at Issue, Without Fact Discovery**

It is well-established that courts can make a substantial similarity determination at the motion to dismiss stage.  Where the works in question are incorporated into a plaintiff's complaint, "it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation."  *Peter F. Gaito Architecture*, 602 F.3d at 64.  No discovery is needed. *See id.* (no discovery necessary because "what is required is only a . . . comparison of the works"); *Polsby v. St. Martin's Press, Inc.*, 8 F. App'x 90, 92 (2d Cir. 2001) (discovery "not necessary for a comparison of the works in order to assess whether, as to the protect[a]ble elements, they were substantially similar").  And critically, "the works themselves, not [any party's] descriptions or impressions of them, are the real test for claims of infringement."  *Walker*, 784 F.2d at 51.

If the court determines that the two works are not substantially similar as a matter of law, the court "can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not 'plausibly give rise to an entitlement to relief.'"  *Peter F. Gaito Architecture*, 602 F.3d at 64 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)); *see also Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 305 (S.D.N.Y. 2005) ("[T]here is ample authority for the proposition that a district court may make [a determination as to substantial similarity] on a motion to dismiss for failure to state a claim under Rule 12(b)(6).") (citing cases). Courts routinely dismiss claims where the alleged similarity "concerns only noncopyrightable elements of plaintiff's work or no reasonable trier of fact could find the works substantially similar."  *Williams*, 84 F.3d at 587 (citation and internal quotation marks omitted).

Here, by simply reading Plaintiff's Treatment and comparing it with any one or more episodes of *From the Bottom Up*—after stripping the works of their abstract ideas and stock

elements—only one conclusion can reasonably be reached: there is no similarity between the protectable elements of the works and Plaintiff's claim of copyright infringement must be rejected.

## II.   PLAINTIFF HAS FAILED TO STATE A CLAIM FOR COPYRIGHT INFRINGEMENT OF THE TREATMENT

Copyright infringement claims involving reality television—a genre whose defining feature is to depict the unscripted "real lives" of real people—routinely fail because the elements that might otherwise constitute protectable expression in a fictional work (plots, characters, themes, dialogue, settings) defy traditional analysis and are often not protectable in the context of reality programming.  *Williams v. A&E Television Networks*, 122 F. Supp. 3d 157 (granting motion to dismiss claim alleging *Married at First Sight* reality series infringed treatment for marriage-themed reality television show); *Castorina*, 784 F. Supp. 2d at 111–12 (E.D.N.Y. 2011) (granting motion to dismiss claim against creators of *Pros v. Joes* reality show that pitted amateur athletes against professional athletes); *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124 (C.D. Cal. 2007) (granting motion to dismiss claim alleging *Rachael Ray* show infringed treatment for reality cooking/talk show).

This case is no different.  The Treatment generally describes the unprotectable idea of a reality television show "highlight[ing] the daily lives of women with publicized scandals seeking redemption" but consists entirely of unprotectable ideas, themes, and biographical facts, without providing a plotline for a single episode, describing the mood of the show, prescribing a format for the show, or providing any detail as to how the themes of the show will be expressed.  Simply put, the Treatment is devoid of protectable expression.  But even assuming the Treatment contained protectable elements, applying the "more discerning ordinary observer" test that governs here, it is clear that the Treatment and *From the Bottom Up* are not substantially similar.  For these reasons, the Court must dismiss Plaintiff's claim.

### A.   The Treatment Does Not Contain Any Protectable Elements to Support a Claim of Infringement

The Treatment suffers from the same flaws that have doomed many previous efforts to copyright ideas for reality programming.  The Treatment consists entirely of unprotectable ideas, facts, and stock elements of the reality television genre and does not contain sufficient protectable elements to support a finding of substantial similarity.  For that reason alone, the Court should dismiss Plaintiff's infringement claim.  *See 8th Wonder Entm't, LLC v. Viacom Int'l, Inc.*, No. 14-cv-01748, 2016 WL 6882832, at *5 (C.D. Cal. Nov. 22, 2016) (concluding that "the court is able to identify few, if any, protectable elements that would give rise to a claim for copyright infringement of the Treatment. . . . [and] this disposes of Plaintiffs' claim . . ."); *Williams v. A & E Television Networks*, 122 F. Supp. 3d at 164–65 (dismissing claim because "[a]lthough the [two works] both embody the idea of a reality show about arranged marriages between strangers, the Treatment does not express the concept in an original manner in which an objective observer could find substantial similarity").

The Treatment describes the basic concept for a reality show "highlight[ing] the daily lives of women with publicized scandals seeking redemption."  Compl. ¶ 13.  But this is nothing more than an idea and is simply not protectable.  *Williams*, 84 F.3d at 587; *Pino v. Viacom, Inc.*, No. 07-cv-3313, 2008 WL 704386, at *5 (D.N.J. Mar. 4, 2008) (finding idea of a "sports-themed reality show that pits amateurs against professional athletes" not protectable); *Rodriguez*, 2008 WL 4449416, at *5 (finding idea of a "fashion reality show" not protectable); *8th Wonder Entm't*, 2016 WL 6882832, at *5 (finding "general idea of a reality television show about women in relationships with famous individuals; a reality television show about the families of hip hop artists" is unprotectable).  And the assertion that the idea was "novel" because "no network at that time had any programming that highlighted the daily lives of women with publicized scandals

seeking redemption," Compl. ¶ 12, in no way transforms the concept from an unprotectable idea into protectable expression. Consider but one example: In *Williams,* the plaintiff's work included the highly novel concept of a modern-day dinosaur zoo on an island, duplicated in defendant's *Jurassic Park*. But, because the expression of this idea in the respective works was not substantially similar, the Second Circuit affirmed the dismissal of the action. *Williams*, 84 F.3d at 587. Moreover, the premise of Plaintiff's "novel" argument is faulty. The reality television market was at the time of the alleged infringement, and continues to be, saturated with programs that follow the daily lives of quasi-celebrities and the everyday struggles of their personal and professional lives.[6] And Plaintiff's focus on "women with publicized scandals seeking redemption" is hardly novel.

The Treatment consists of the factual biographies of the cast members (Ex. B at 2-3, 9-13), scattered lists of "themes" for the program (*id.* at 4), and general ideas for "drama" between the cast members or personal projects each cast member will pursue during the show (*id.* at 5). But none of this is protectable expression. The biographical facts of the cast are not copyrightable. *8th Wonder Entm't*, 2016 WL 6882832, at *7 ("Plaintiffs provide no authority, nor can the court identify any, for the proposition that the development of real life characters in a television show renders the facts of their biography copyrightable."). General themes of redemption, overcoming adversity, and overcoming negative perceptions are universal themes in art that are not protectable in the absence of a specific thematic approach or creative, original expression of those themes.

---

[6] Defendants request that the Court take judicial notice of these elements as common elements of the reality television genre. *See* Fed. R. Evid. 201(b). Courts take judicial notice of elements of a particular genre where the elements "can be verified simply by watching television for any length of time." *See Zella*, 529 F. Supp. 2d at 1129 (taking notice of the elements of a cooking/talk show); *DuckHole Inc. v. NBC Universal Media LLC*, No. CV 12-10077 BRO CWX, 2013 WL 5797279, at *4 (C.D. Cal. Sept. 6, 2013) (taking notice of the tone and certain plot ideas "common to comedic television shows").

*CBS Broad.*, 2012 WL 13013027, at *6 (concluding that saying "episodes will be 'about trust, betrayal, ambition, disappointment, bonding, competitiveness, and affection' . . . "is to say that anything can happen, and themes that are common to all literature for all time may arise during recording").  And the "drama" between cast members that Plaintiff proposes in her Treatment is nothing more than an unprotectable stock element—an essential element—of the reality television genre. *See Contender Partners, LLC v. Azteca Int'l Corp.*, No. CV 08-02026, 2009 WL 10670472, at *14 (C.D. Cal. July 22, 2009) (finding that "the combination of boxing with 'personal drama,' cannot be considered a protectable element of 'The Contender,' as the focus on 'personal drama' in the lives of non-actors involved in a competition is a feature common to most of the reality TV genre").

Nor did Plaintiff make any attempt to select, coordinate, or arrange these unprotectable elements in an original way.  The Treatment completely fails to elaborate how the concept for the program is to be *expressed*.  There are no story lines for any episode, or even broad story arcs for an entire season.  There is no description of the format of the program and no detail concerning how the characters will develop over time.  This lack of detail "undercuts [the Treatment's] protectability" and ultimately dooms Plaintiff's claim.  *Castorina*, 784 F. Supp. 2d at 111–12 ("Unfortunately for Plaintiffs, the 'Two Left Feet' treatment contains limited 'original' 'select[ion], coordinat[ion], and arrange[ment]' of unprotectable elements. . . . But the treatment's vagueness, however intentional, also undercuts its protectability, because—the less 'specifics' and 'detail' it contained, the less it uniquely and imaginatively 'selected, coordinated, and arranged' the stock elements contained within."); *Williams v. A & E Television Networks*, 122 F. Supp. 3d at 164 (same).  Since the Treatment contains no protectable expression, it cannot support a claim of copyright infringement.

17

**B.      The Two Works Are Not Substantially Similar**

Even assuming the Court could glean a modicum of protectable expression from the Treatment, it still does not amount to substantial similarity with *From the Bottom Up*.  Plaintiff alleges that the settings, plots, characters, theme, and mood are the same in both works.  But an analysis of the two works, applying the "more discerning ordinary observer" test, makes clear that Plaintiff's allegations hold no water.  Not only are the plots and characters of the two works wholly dissimilar, but any similarities between the two works relate to unprotectable ideas, facts, and scènes à faire.  There is no substantial similarity of *protected expression* between the two works here, and this mandates dismissal.

**1.      The Plots Are Not Substantially Similar**

The "plots" of the two works are wholly dissimilar.[7]  Plaintiff alleges that the plots of the two works are "identical."  Compl. ¶ 41.  But that cannot be.  The Treatment has no plot.  Nowhere over the course of nineteen pages does the Treatment outline or in any way describe the storyline of even one episode of *Real Life Cinderellas Atlanta*.  By contrast, *From the Bottom Up*, is a three-season series with developed storylines and character arcs.  *See supra* at 7-9 (summarizing several episodes).  Plaintiff now attempts to gloss over this critical difference between the two works by characterizing the plot as: "1) bad publicity in the media; 2) different or changed circumstances; 3) starting over and trying to obtain success in personal and professional life."  Compl. ¶ 41.  But this is merely restating an unprotectable idea for a show that features cast members who have experienced negative media publicity and are now trying to rebuild their lives.  As courts have long held, "[n]o one can own the basic idea for a story."  *Bethea v. Burnett*, No. CV04-7690, 2005

---

[7] Reality programming, due to its unscripted, "real" nature, "do[es] not, as a general matter, entail a 'plot as that term is normally used' in the context of copyright law."  *CBS Broad.*, 2012 WL 13013027, at *8.

WL 1720631, at *11 (C.D. Cal. June 28, 2005) (finding "claim that the 'plot' of both reality television programs is similar because both programs 'depict a group of dynamic contestants from varied backgrounds competing in business challenges in a dynamic corporate environment for promotions and benefits and, ultimately, a real job as a top-level executive of a corporation'" to be "nothing more than a string of generic 'ideas' which is not protected by copyright law"); *Pino*, 2008 WL 704386, at *5 (holding idea of a "sports-themed reality show that pits amateurs against professional athletes" is not protectable). Moreover, Plaintiff's characterization of the "plot" is impermissibly abstract. Courts have long recognized that all plots, "when abstracted to a sufficient level of generalization, can be described as similar to other plots." *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990). As Judge Learned Hand long ago explained:

> Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. . . . [T]here is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).

The only specific plot similarity that Plaintiff identifies is that in both the unregistered sizzle reel and one episode of Season 2 of *From the Bottom Up* the cast members attend a pole dancing class. Compl. ¶¶ 17, 44. This similarity, however, does not advance Plaintiff's claim. The idea for a pole-dancing episode is not protected by copyright law, and tellingly, Plaintiff makes no effort to explain how this basic idea is expressed similarly in *From the Bottom Up*. Nor does the idea even appear in the registered Treatment. *See* Ex. B. This alleged similarity between the sizzle reel and *From the Bottom Up* therefore cannot support a finding of substantial similarity.

## 2.      The Characters Are Not Substantially Similar

The characters in the Treatment and the Series are completely dissimilar.  *Compare supra*

at 4 (characters in the Treatment) *with supra* at 6-7 (characters in Seasons 1-3 of the Series).

Plaintiff glosses over this distinction by alleging that the *types* of characters in the two works are

the same.  Specifically, Plaintiff alleges that the characters in the two works are similar because

*From the Bottom Up* "also uses the same artistic choices in cast members" and that:

> The characters of both shows, are five African-American women of
> a specific type (singers, actresses, business owners, and the former
> paramour of a high profile professional athlete) who seemed to have
> "had it all," but their personal and professional lives were ruined due
> to public scandal: each either served time in prison, cheated on their
> husbands, or were arrested for DUI, substance abuse, and/or
> domestic violence.

Compl. ¶ 43.  Here, again, Plaintiff bases her claim on unprotectable expression.  Even if the cast

members in the Treatment and in the Series were exactly the same (and they are not), the cast

members in both works are real women whose biographies are non-copyrightable facts and thus

cannot support a finding of substantial similarity.  *8th Wonder Entm't*, 2016 WL 6882832, at *7

("Plaintiffs provide no authority, nor can the court identify any, for the proposition that the

development of real life characters in a television show renders the facts of their biography

copyrightable."); *CBS Broad.*, 2012 WL 130130, at *6 ("Does [plaintiff's expert] really contend

that a diverse set of contestants [on the show Big Brother] constitutes an array of 'characters' that

are drawn with sufficient particularity that they warrant copyright protection?  The Court has found

no support in any case law for that proposition.").  Recasting this as a similarity in "character

types" does not salvage Plaintiff's claim.  In *Milano v. NBC Universal, Inc.*, for example, the court

rejected a similar attempt to show substantial similarity based on character types in a reality

television treatment and observed:

20

> The treatment discusses what might be called stock characters or types, but nothing beyond that.  For example, the treatment describes a young man who cannot be a firefighter because he is overweight, and a scorned wife who, after gaining weight, lost her husband to a younger, slimmer woman. The treatment explains that their personal stories will make up an important part of the program. While this is no doubt true, it is not a description of any particular participant who will compete on the program because reality shows do not involve fictional characters. Character is developed entirely through the dynamic interaction of the contestants over the course of the program.

584 F. Supp. 2d 1288, 1296-97 (C.D. Cal. 2008).

Plaintiff makes two additional allegations regarding the characters in the two shows: (1) that "Season 2 of *From the Bottom Up*' specifically cast Maia Campbell as the main member of the show, in the identical fashion as suggested by *Real Life Cinderellas of Atlanta*'"; and (2) that "[a]t some point, BET was also considering adding Dominique Scott to the cast of the *From the Bottom Up*' and who was also in Lee's sizzle reel to work as a mentor and advise the cast on how to move forward with their past mistakes."  *Id.* ¶¶ 45-46.  These allegations lack merit.  Maia Campbell and Dominique Scott are real women whose biographical facts cannot be copyrighted.  *See 8th Wonder Entm't*, 2016 WL 6882832, at *7.  That Plaintiff might have envisioned either woman as a cast member is at best an unprotectable idea.  *Bethea*, 2005 WL 1720631, at *13 ("Plaintiffs cannot copyright the idea of having a well-known business leader, or even more specifically Donald Trump, host a reality television program.").  Plaintiff simply cannot lay claim to the cast members or the factual events of their lives as though they were original works she created.  Characters therefore do not support a finding of substantial similarity here.

### 3.    The Theme and Mood Are Not Substantially Similar

There is no substantial similarity in the themes and mood of the two works.  Plaintiff alleges that the theme and mood are similar because "[t]he overall premise of the show featured five African-American quasi-celebrity women living in Atlanta, Georgia who have all experienced

21

media scandals and [are] working toward turning their lives around." Compl. ¶ 14.  The Treatment, however, contains little more than scattered tag lines such as "You think you know us, but you have no clue!"; "It Factor: Yes, that's who we were and those are the things that we endured but this is who we are now and this is what we are doing."  Ex. B.  Even crediting those phrases as "themes," the Treatment contains no exposition of those themes.  Nor does the Treatment prescribe any particular mood for the show or detail how the show's mood is to be expressed.  As a result, neither theme nor mood can support a finding of substantial similarity here.  *See Milano*, 584 F. Supp. 2d at 1297 ("The treatment includes themes of competition, weight loss, diets, fitness programs, and the like. However, . . . these themes are really ideas that are not protectable."); *8th Wonder Entm't*, 2016 WL 6882832, at *6 (rejecting plaintiffs' argument that phrases in a treatment, such as "knowing when to let love go," "a man does not always have to take the lead in a relationship," "friendship amongst a group of women," supported substantial similarity in theme because "aside from general statements, the Treatment contains little exposition of any 'theme'"); *id.* at *7 (finding mood did not support a finding of substantial similarity because "the Treatment contains no discernible mood" and is "a composition of biographical facts and general accounts of a concept [and] [i]f the Treatment were ever produced, it could just as easily have a 'light' mood as a 'dark' one").

*From the Bottom Up*, by contrast, does have a discernable mood and has developed several themes over the course of three seasons.  The Series demonstrates how difficult it is to rebuild a life, both personally and professionally, after committing a crime. For example, in one episode Christine and Kim attend a family therapy session together during which their children discuss the sadness they felt and challenges they faced while their mothers were imprisoned.  Ex. C at 102. Another episode features Christine unsuccessfully looking for work and discussing how difficult

it is to earn a living after being released from jail.  *Id.*  The Series also explores the theme of finding emotional support, strength, and encouragement through friendship, particularly friends who have had similar life experiences.  In Season 1, Episode 104, for example, the group attends Chrystale's charity gala and the grand opening of Kim's new salon, celebrates with Chrystale and Kim, and encourages them in their new endeavors.  Ex. C at Episode 104.  In numerous scenes throughout the Series the women meet one-on-one or with other friends to discuss their problems, cry together, and encourage each other.  *See, e.g.*, Episode 102 (Staci and Chrystale meet at Staci's home to try to reconcile after an argument), Episode 203 (Chrystale and Maia meet to discuss their emotional issues and the public's perception of Maia).  In light of these themes, the mood of the Series varies from scene to scene and is at turns highly emotional and sad but also uplifting, hopeful, and sometimes even light as the women have fun together.  Comparing these well-developed themes and moods in *From the Bottom Up* to the Treatment, which entirely lacks these elements, it is clear that the themes and mood of the two works are not substantially similar.

### 4.    The Settings Are Not Substantially Similar

The Atlanta, Georgia setting in both the Treatment and the Series is at best an unprotectable idea or a scène à faire that necessarily flows from the idea of a show that depicts the daily lives of quasi-celebrity, African-American women.  *Rodriguez*, 2008 WL 4449416, at *5 (finding setting of New York was an unprotectable scène à faire that "necessarily flow[s] from the uncopyrightable idea of a fashion design reality show").  As Plaintiff acknowledges, Atlanta is "uniquely situated with a rich history of successful African-American women," Compl. ¶ 42, and is therefore an obvious setting for both works.  Indeed, several reality shows focusing on the lives of African-American women take place in Atlanta, including *Love & Hip Hop: Atlanta*, *Real Housewives of Atlanta*, *Little Women: Atlanta*, and *Cutting It in the ATL*.  Setting, therefore, provides no basis to find substantial similarity here.

### 5.      The Total Concept and Feel of the Two Works Are Different

The total concept and feel of a work refers to the way the author selected, coordinated and arranged the elements of the work, taking into consideration similarities in "mood, details or characterization." *Reyher*, 533 F.2d at 92-93.  In comparing the total concept and feel of the works, courts consider the works as a whole.  *See Jones*, 733 F. Supp. at 754.

The total concept and feel of the two works is wholly dissimilar.  The Treatment describes a concept for a show about women who have received negative media attention—without describing the specific public scandal in which every woman has been involved—but in reality are not what the public perceives them to be; provides the general biographies of each cast member; and lists general themes, ideas for drama/conflict amongst the cast members, and potential projects each woman will pursue during the show.  *See* Ex. B.  The Treatment otherwise does not develop the concept of the show in any way and fails to provide any roadmap or vision as to the show's format, mood, or storylines.  *Id.*  The Treatment simply leaves too many questions unanswered, and it is therefore difficult to even ascribe a "total concept and feel" to it.  The Series has a different set of cast members (with the exception of Maia Campbell), and by contrast to the Treatment, has developed several themes, highlighting, for example, the challenges in rebuilding a life after committing a crime and the importance of seeking finding emotional support, strength, and encouragement through friendship.  *See* Ex. C.  The Series has distinct moods—often highly emotional and sad, at other times hopeful, and others light and fun—and developed storylines for each cast member over the course of three seasons.  *Id.*  The total concept and feel of the two works is therefore not substantially similar.

### CONCLUSION

Plaintiff's registered treatment for *Real Life Cinderellas Atlanta* and the series *From the Bottom Up* are not substantially similar and, therefore, Plaintiff's claim amounts to nothing more

than an attempt to copyright an idea.  Defendants respectfully request that the Court dismiss

Plaintiff's claim with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated:  New York, New York
          June 4, 2019

                                        Respectfully submitted,

                                        DAVIS WRIGHT TREMAINE LLP

                                         */s/ Elizabeth A. McNamara*_____
                                        Elizabeth A. McNamara
                                        Jeremy A. Chase
                                        Meredith I. Santana
                                        1251 Avenue of the Americas, 21st Floor
                                        New York, NY  10020-1104
                                        Telephone: (212) 489-8230
                                        Email: lizmcnamara@dwt.com
                                               jeremychase@dwt.com
                                               meredithsantana@dwt.com

                                        *Attorneys for Defendant Black Entertainment
                                        Television LLC*

                                        EISENBERG TANCHUM & LEVY LLP

                                        */s/ Stewart L. Levy*_____
                                        Stewart L. Levy
                                        707 Westchester Avenue, Suite 300
                                        White Plains, New York 10604
                                        Telephone: (212) 599-0777
                                        Email: slevy@etllaw.com

                                        *Attorneys for Defendant Flavor Unit Entertainment,
                                        Inc.*

                                        NICOLE J. COWARD, PLLC

                                        */s/ Nicole J. Coward*_____
                                        Nicole J. Coward
                                        8 West 126th Street, 3rd Floor
                                        New York, New York 10027
                                        Telephone: (646) 798-4500
                                        Email: nicole@nicolecowardlaw.com

                                        *Attorneys for Defendant Nicci Gilbert*

25